Richard D. McCune, Esq., State Bar No. 132124
rdm@mccunewright.com
David C. Wright, Esq., State Bar No. 177468
dcw@mccunewright.com
MCCUNE WRIGHT AREVALO, LLP
3281 E. Guasti Road, Suite 100
Ontario, California 91761
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

BENEDICT O. KWON, State Bar No. 219052
bkwon@sycr.com
STEPHEN L. RAM, State Bar No. 240769
sram@sycr.com
STRADLING YOCCA CARLSON & RAUTH, P.C.
660 Newport Center Drive, Suite 1600
Newport Beach, CA 92660-6422
Telephone: (949) 725-4000
Facsimile: (949) 725-4100

Attorneys for Plaintiffs JI CHANG SON, GHODRAT
KHANSARI, MADHUSUDHANA SHASTRULA,
ALI JARRAHI, and MICHAEL TOMKO, individually
and on behalf of the Putative Class, and
Plaintiff K.M.S., a minor by and through his
*Guardian ad Litem* YUN SOO OH

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JI CHANG SON, GHODRAT KHANSARI, MADHUSUDHANA SHASTRULA, ALI JARRAHI, and MICHAEL TOMKO individually and on behalf of all others similarly situated, and K.M.S., a minor by and through his *Guardian ad Litem* YUN SOO OH,<br><br>Plaintiffs,<br><br>v.<br><br>TESLA, INC.,<br><br>Defendant. | Case No.: 8:16-cv-02282-JVS-KESx<br><br>Judge Assigned: Hon. James V. Selna<br>Complaint filed: December 30, 2016<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND/OR STRIKE**<br><br>Date: May, 19, 2017<br>Time: 1:30 p.m.<br>Courtroom: 10C |

# TABLE OF CONTENTS

*Page*

I INTRODUCTION ............................................................. 1

II OVERVIEW OF ALLEGATIONS ........................................ 4

III LEGAL STANDARD ...................................................... 10

IV ARGUMENT.................................................................. 10

 A. Plaintiffs Have Adequately Plead Breach of Express Warranty and Breach of Contract/Common Law Warranty Claims.................................. 10

  1. Plaintiff Adequately Pleads Defects in Materials and Workmanship, in Addition to Allegations of Design Defect, That Are Covered by Tesla's Basic Vehicle Limited Warranty............................................. 11

  2. Tesla's Specific Representations Regarding the Safety of the Model S and Model X Vehicles Create Additional Warranties Not Limited to Defects in Workmanship and Materials.................... 13

   a. Because Tesla Is the Direct Seller of the Model S and Model X Vehicles to Its Customers, Plaintiffs Need Not Allege Specific Reliance on Tesla's Representations ............. 15

 B. Plaintiff Shastrula Concedes the Ohio Deceptive Trade Practices Act Cause of Action (Count 23) ........................................................ 17

 C. Plaintiffs Sufficiently Pleaded a Cause of Action Under the Ohio Consumer Sales Practices Act (Count 22) ................................................ 17

  1. Defendant Had Sufficient Notice that Its Conduct Violated OCSPA Through Specific Rules and Regulations and Relevant Case Law...................................................................... 18

 D. Plaintiffs Sufficiently Pleaded a Cause of Action Under the Georgia Uniform Deceptive Trade Practices Act (Count 13)................................... 20

i

**TABLE OF CONTENTS (cont.)**

*Page*

E.   Plaintiffs Sufficiently Pleaded a Cause of Action Under the Georgia Fair Business Practices Act (Count 14)..............................................................22

  1.   Defendant Had Pre-Suit Written Notice of Pending Litigation..........22

  2.   Alternatively, Plaintiffs Respectfully Request the Court Dismiss the Georgia Fair Business Practices Act Claim Without Prejudice....23

F.   Plaintiffs Validly Assert Georgia's Unjust Enrichment Claim in the Alternative (Count 18) ..................................................................24

G.   Plaintiffs Request Leave to Amend to Cure Any Deficiencies....................24

V    CONCLUSION........................................................................................25

Plaintiffs' Opposition to Defendant Motion to Dismiss and/or Strike
Case No.:  8:16-cv-02282-JVS-KESx

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Asghari v. Volkswagen Group of Am., Inc.,*
42 F. Supp. 3d 1306 (C.D. Cal. 2013) ...................................................16

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ...........................................................................10

*Blankenship v. CFMOTO Powersports, Inc.,*
2011-Ohio-948, 161 Ohio Misc. 2d 5, 944 N.E.2d 769 .................18, 19, 20

*Clark v. Aaron's, Inc.,*
914 F. Supp. 2d 1301 (N.D. Ga. 2012) ................................................24

*Coleman v. Boston Scientific Corp.,* 1:10–CV–01968,
2011 WL 3813173 (E.D.Cal. Aug. 29, 2011) ........................................16

*Colonial Lincoln-Mercury Sales, Inc. v. Molina,*
152 Ga. App. 379, 262 S.E.2d 820 (1979) ............................................22

*Corcoran v. CBS Health Corp.,*
169 F. Supp. 3d 970 (N.D. Cal. 2016) .................................................23

*Cousins v. Lockyer,*
568 F.3d 1063 (9th Cir. 2009) ...........................................................10

*Crown Ford, Inc. v. Crawford,*
221 Ga. App. 881, 473 S.E.2d 554 (1996) ............................................22

*Garcia v. Chrysler Group, LLC,*
127 F. Supp. 3d 212 (S.D.N.Y. 2015) .................................................21

*Hardt v. Chrysler Group,*
No. SACV1401375SJOVBKX, 2015 WL 12683965 (C.D. Cal. June 15, 2015) ...13

*Harlan v. Roadtrek Motorhomes, Inc.,*
No. 07-CV-0686 IEG (BLM), 2009 WL 928309 (S.D. Cal. Apr. 2, 2009) ...........13

*Horn v. Boston Scientific Neuromodulation Corp.,*
No. CV409–074, 2011 WL 3893812 (S.D. Ga. Aug. 26, 2011) ..........................17

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.,*
350 F. Supp. 2d 160 (D. Me. 2004) .....................................................23

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.,*
754 F. Supp. 2d 1145 (C.D. Cal. 2010) ................................................15

*Johnson v. Microsoft Corp.,*
2003-Ohio-7153, 155 Ohio App. 3d 626, 802 N.E.2d 712 (2003) ........................17

iii

# TABLE OF AUTHORITIES (cont.)

*Page(s)*

**Cases (cont.)**

*Keegan v. American Honda Motor Co., Inc.*,
284 F.R.D. 504 (C.D. Cal. 2012)................................................................16

*Keith v. Buchanan*,
173 Cal. App. 3d 13, 220 Cal. Rptr. 392 (1985) ......................................15

Lopez v. Smith,
203 F.3d 1122 (9th Cir. 2000) ..................................................................25

*Lynas v. Williams*,
216 Ga. App. 434, 454 S.E.2d 570 (1995) ...............................................22

*Marrone v. Philip Morris USA, Inc.*,
2006-Ohio-2869, 110 Ohio St. 3d 5, 850 N.E.2d 31 (2006) ...........18, 21, 22

*McCabe v. American Honda Motor Co.*,
100 Cal. App. 4th 1111, 123 Cal. Rptr. 2d 303 (2002) .....................11, 12

*Navarro v. Block*,
250 F.3d 729 (9th Cir. 2001) ....................................................................10

*Plaza Pontiac, Inc. v. Shaw*,
158 Ga. App. 799, 282 S.E.2d 383 (1981) ...............................................22

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ..................................................................10

*Stringer v. Bugg*,
254 Ga. App. 745, 563 S.E.2d 447 (2002) ...............................................22

*Troup v. Toyota Motor Corp.*,
545 Fed App'x 668 (9th Cir. 2013) ...........................................................12

*Weinstat v. Dentsply Intern., Inc.*,
180 Cal. App. 4th 1213, 103 Cal. Rptr.  (2010) ................................15, 16

*WESI, LLC v. Compass Envtl., Inc.*,
509 F. Supp. 2d 1353 (N.D. Ga. 2007)......................................................24

*Williams v. Beechnut Nutrition Corp.*,
185 Cal. App. 3d 135, 229 Cal. Rptr. 605 (1986) ....................................14

*Wingate Land & Dev., LLC v. Robert C. Walker, Inc.*,
252 Ga. App. 818, 558 S.E.2d 13 (2001) .................................................24

**Statutes**

California Comm. Code § 2313 ...........................................................14, 16

Plaintiffs' Opposition to Defendant Motion to Dismiss and/or Strike
Case No.:  8:16-cv-02282-JVS-KESx

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES (cont.)

*Page(s)*

**Statutes (cont.)**

Ga. Code Ann. § 10-1-373(a) ...................................................................20

Ga. Code Ann. § 10-1-399(b) ...................................................................22

Ohio Rev. Code Ann § 1345.01 ................................................................18

Ohio Rev. Code Ann § 1345.02 ................................................................18

Ohio Rev. Code Ann § 1345.03 ................................................................18

Ohio Rev. Code Ann. § 1345.05 ...............................................................17

Rules

Fed. R. Civ. P. 8(d)(2)..............................................................................24

Fed. R. Civ. P. 8(d)(3)..............................................................................24

Fed. R. Civ. P. 12(b)(6)............................................................................10

Regulations

O.A.C. § 109:4-3-01 .................................................................................18

O.A.C. § 109:4-3-02 .................................................................................19

O.A.C. § 109:4-3-10 .................................................................................19

Other Authorities

U.C.C. § 2-313 .........................................................................................17

# I     INTRODUCTION

Tesla, Inc. ("Tesla" or "Defendant") is the manufacturer of the Model S sedan and Model X cross-over sport utility vehicle ("SUV") – identified by Tesla as two of the most technologically advanced and powerful production automobiles ever sold to the general public.  And though Tesla prides itself on innovation, describing itself as a "software company as much as it is a hardware company," when confronted with a statistically alarming number of crashes in which drivers report that without the driver applying the accelerator pedal, the vehicle accelerated at full power on its own under remarkably consistent circumstances, Tesla has opted to take a very traditional response to these claims – namely, to blame the drivers.

Just as Toyota did before it, Tesla has steadfastly ignored the overwhelming and mounting statistical evidence that its vehicles suffer from a dangerous safety defect, and ignored the numerous claims of its own consumers that their vehicles have exhibited sudden unintended acceleration ("SUA"), instead maintaining that in each and every instance that these crashes of these vehicles "resulted from human error."  (Mot. at 1:14-15.)

The evidence as alleged in the First Amended Complaint that a defect in the Model S and Model X vehicles makes them susceptible to SUA is significant in two respects. The first is the frequency with which Tesla vehicles are experiencing SUA.

According to a study by NASA of unintended acceleration reports to the National Highway Traffic Administration ("NHTSA"), from 2000 to 2010, the rate of SUA incidents was 1 per 100,000 vehicles per year.  (First Amended Complaint, Dkt. No. 25 ("FAC"), ¶ 25.)  To be clear, this is the rate of claims of SUA incidents, regardless of the actual cause of such incidents.  By contrast, with approximately 18,240 Model X vehicles sold in the United States from September 29, 2015, through the end of 2016, there have been at least 13 reports, either to NHTSA or directly to Tesla, of sudden unintended acceleration incidents involving Model X vehicles – **a rate of 71 SUA events per 100,000 vehicles per year.**  (*Id.* ¶¶ 27, 64.)  Even more alarming than a seventy-fold rate

Plaintiffs' Opposition to Defendant Motion to Dismiss and/or Strike
Case No.:  8:16-cv-02282-JVS-KESx

of SUA claims in relation to other vehicles, is the realization that the previous most significant SUA defect litigation in modern history – *In re: Toyota Motor Corp Unintended Acceleration Marketing, Sales, Practices And Product Liability Litigation* – involved SUA rates significantly lower than those of the Model S and Model X vehicles. As referenced in the FAC, an analysis of NHTSA data by Consumer Reports showed that 2008 model year Toyotas – which included vehicles for which Toyota subsequently implemented two safety recall campaigns relating to SUA – showed a SUA claim rate of approximately 2 per 100,000 vehicles.  (*Id.* ¶ 26.)

But the second, and even more compelling, aspect of the evidence of these other instances of SUA, is the consistency of the circumstances in which these vehicles are exhibiting SUA.  With regard to the Model X, all 13 of the complaints of SUA referenced in the FAC were described to have occurred while the vehicle was travelling at an extremely slow speed, either while the driver was in the process of parking the vehicle or while driving at a very slow speed, such as when stopping or starting at a traffic control signal.  And a second common characteristic of these SUA events is that the vehicles are uniformly described as experiencing 100 percent full power acceleration.  This is significant because if, as Tesla suggests in its Motion, each and every one of these reported instances of SUA were the result of driver error in misapplying the accelerator pedal instead of the brake pedal, one would expect the driving circumstances in which these SUA events happen to vary along with the many different circumstances in which people drive generally – i.e. SUA occurring at different speeds and drivers applying different percentages of acceleration rather than full 100 percent acceleration.

It is undoubtedly this common characteristic of parking/slow speed that are to account for the fact that these reported SUA instances have not resulted in serious injury or death.  But with SUA incidents occurring at this rate, it is only a matter of time before someone will be standing in the path of one of these vehicles with catastrophic consequences.

It is against this backdrop that Tesla challenges only the causes of action for breach of express warranty, breach of contract/common law warranty, and certain non-California statutory causes of action. Defendant contends that Plaintiffs' express warranty claims are barred by language included in Tesla's Basic Vehicle Limited Warranty that purports to limit its warranty to "defects in the materials or workmanship of any parts manufactured or supplied by Tesla." (Mot. at 4:15-16.) Defendant's argument fails for two reasons. First, Defendant misconstrues the Complaint as alleging only "uniform design defect" in the Model S and Model X vehicles when, in fact, the FAC contains numerous allegations of defects in manufacturing and materials. Second, Plaintiff has adequately alleged the existence of additional warranties created by Tesla's advertising that includes numerous promises of safety that are representations of fact sufficient to give rise to additional warranties, separate and apart from the Basic Vehicle Limited Warranty and which are not limited by the Basic Vehicle Limited Warranty's waiver of liability for design defects.

Defendant also challenges several statutory causes of action under Ohio and Georgia law. Defendant's argument fails for four reasons. First, Plaintiffs satisfied all of Ohio's pleading requirements under the Consumer Sales Practices Act. Second, Plaintiffs sufficiently pleaded future injury to support injunctive relief. Third, Defendant's had sufficient pre-suit notice to facilitate resolution of this action. Lastly, Plaintiffs sufficiently pleaded alternative claims under Rule 8(d)(3).

Finally, Defendant does not challenge the sufficiency of the allegations of the personal injury claims of Plaintiffs Son and K.M.S. for strict product liability (Count 10); strict product liability for failure to warn (Count 11); negligence (Count 12). Nor does Defendant challenge the sufficiency of the allegations in the FAC as to Plaintiffs', on behalf of the putative classes, causes of action for violation of the California Consumer Legal Remedies Act ("CLRA") (Count 1); violation of California Unfair Competition Law ("UCL") (Count 2); violation of California False Advertising Law (Count 3); breach of implied warranty (Count 5); violation of the Song-Beverly Consumer Warranty Act for

breach of the implied warranty of merchantability (Count 9); breach of the implied warranty of merchantability under Georgia, North Carolina, and Ohio law (Counts 16, 19, and 25, respectively); unjust enrichment under North Carolina law (Count 21); negligent design, engineering and manufacture under Ohio law (Count 26); and unjust enrichment under Ohio law (Count 27).

## II    OVERVIEW OF ALLEGATIONS

Tesla, Inc. (formerly Tesla Motors, Inc.), is an automobile manufacturing and technology company that first entered the vehicle market with the production of the Tesla Roadster, an all-electric sports car.  In 2012, it began selling the Model S, an all-electric luxury sedan.  And in the quarter of 2015, Tesla began selling the Model X,[1] an all-electric luxury crossover SUV.  (FAC ¶ 1.)  Tesla designs, develops, manufactures, and sells electric vehicles and electric vehicle powertrain components.  Tesla markets and sells its vehicles directly to consumers through Tesla stores, as well as via the Internet.  As of October 2016, the company operated a network of 99 Tesla Stores and Galleries in the United States, of which 28 are located within California.  (*Id.* ¶ 45.)

The highly-touted ability of the Tesla vehicle computers to understand their environment is futuristic.  The vehicles are programmed to remember where home is, to remember the preferred routes of going home, to open the garage door at home, and to raise the suspension when the driver gets home to better handle the slope of the driveway.  The driver can exit the vehicle and the Tesla will open the garage door, enter the garage, park itself, and shut down without a driver operating the vehicle.  It also can be summoned by a driver with a cell phone – the vehicle, without a driver, will open the garage door, exit the garage, and drive itself to the driver who summoned the car.  (*Id.* ¶ 7.)

---

[1] Following the delivery of the 6 Founders' Series vehicles at the launching ceremony for the Model X, Tesla only sold approximately 206 Model X vehicles in the fourth quarter of 2015.  Sales really began in the first quarter of 2016.

The Model S and Model X have greater acceleration than any other production sedan and SUV, respectively, in history.  Since its introduction in 2012, Tesla continued to increase the power and performance of the Model S.  In its Fourth Quarter & Full Year 2016 Update, Tesla announced that the Model S P100D had posted a record setting 0 to 60 miles per hour in 2.275 seconds – the fastest vehicle acceleration ever recorded by Motor Trend, "including million dollar, two-seat, gasoline-powered super cars with almost no cargo space."  (FAC ¶ 47.)  Similarly, Tesla introduced the Model X in two performance packages: 1) P90D that can accelerate from 0 to 60 m.p.h. in 3.8 seconds; and 2) the Ludicrous P90D that can accelerate from 0 to 60 m.p.h. in 3.2 seconds.  The Model X has a top speed of 155 m.p.h.  Tesla now offers the Model with a 100 kWh battery that can accelerate the Model X "from zero to 60 miles per hour in as quick as 2.9 seconds."  (*Id.* ¶¶ 49-50.)

## A.   Tesla's Marketing of the Safety of the Model S and Model X

Tesla marketed its Model S sedan as being "designed from the ground up to be the safest car on the road."  (FAC ¶ 51.)  Similarly, Tesla marketed its Model X SUV as being "designed to be the safest car on the road," with every Model X coming "standard with automatic emergency braking and side collision avoidance to prevent accidents from happening in the first place."  (*Id.* ¶ 55.)

Beginning in March 2015, Tesla marketed a feature included in its version 6.2 software update for the Model called Automatic Emergency Braking, describing it as a new "Collision Avoidance Assist" feature that automatically engages the brakes to reduce the impact of an unavoidable frontal collision.  (FAC ¶ 53.)  This feature was also marketed by Tesla as being included in all Model X vehicles.  As described in the Model X Owner's Manual, "Forward Collision Warning" and "Automatic Emergency Braking" are "collision avoidance features are designed to increase the safety of you and your passengers":

> •     Forward Collision Warning provides visual and audible warnings in situations where there is a high risk of a frontal collision . . . .

Plaintiffs' Opposition to Defendant Motion to Dismiss and/or Strike
Case No.:  8:16-cv-02282-JVS-KESx

- Automatic Emergency Braking automatically applies braking to reduce the impact of a frontal collision . . . .

(FAC ¶ 58.)  Tesla further told its consumers: "The forward looking camera and the radar sensor are designed to determine the distance from any object (vehicle, motorcycle, bicycle, or pedestrian) traveling in front of Model X.  When a frontal collision is considered unavoidable, Automatic Emergency Braking is designed to automatically apply the brakes to reduce the severity of the impact.  (*Id.*)

In addition, Tesla also promoted its "over-the-air software updates" allowing Tesla to "regularly improve the sophistication of these features, enabling increasingly capable safety and convenience features."  (FAC ¶ 57.)

Tesla proclaims that the Model X is "the safest, fastest and most capable sport utility vehicle in history."  (FAC ¶ 18.)  In press releases, sales literature, brochures, online statements, and other consumer-oriented documents, Tesla has consistently promoted "safety" as top priority in all its vehicles, generally, and in the Model X, specifically.  (*Id.* at ¶ 19.)

## B.   The Susceptibility of the Model S and Model X to Sudden Unintended Full Power Acceleration While the Vehicle Is Stopped or Moving at Very Low Speed

What has become evident since the introduction of the Model S, and markedly more so since the release of the Model X, is that these vehicles are experiencing sudden unintentional full power acceleration at an unprecedented frequency and in remarkably consistent circumstances.  Defendant has had notice of these incidents by virtue of complaints being registered with the publicly available NHTSA Vehicle Owner Questionnaire ("VOQ") database, and direct reports to Tesla from its own customers.

In the four years since the introduction of the Model S, there have been 13 reports to the National Highway Traffic Safety Administration in which Model S drivers report having experienced full power acceleration either while in the act of parking the Model S or while driving at slow speed, 12 of which resulted in a crash of the vehicle, just as

6

both Plaintiff Khansari and Plaintiff Tomko's spouse experienced.  And while this rate of SUA claims would be alarming enough in its own rate, it was nothing compared to the 13 nearly identical instances in which drivers of the Model X experienced full power acceleration either while in the act of parking the Model X or while driving the Model X at slow speed – ten of which resulted in a crash of the vehicle – in the first full year of production of the Model X.

Sudden Unintended Acceleration ("SUA") is a well-known safety issue. According to a study by NASA of unintended acceleration reports to the National Highway Traffic Administration from 2000 to 2010, there rate of SUA incidents was 1 per 100,000 vehicles per year.  (FAC ¶ 25.)  By comparison, within the first year of Model X vehicles being on the road, and with only 18,240 Model X vehicles in use (the vast majority of which have been on the road significantly less than one year), there have been thirteen (13) publicly reported incidents of sudden unintended acceleration resulting in a staggeringly high and unprecedented calculated rate of 71 SUA incidents per 100,000 vehicles per year.  (*Id.* ¶ 27.)  Even more remarkable is the fact that the vast majority of these incidents (and *all* of the incidents involving the Model X) occurred under nearly identical experiences where the driver was either in the process of parking or traveling at a very low speed, as is summarized in the following table, *id.* at 21-22:

| Date | Complaint # / Plaintiff | Model | Circumstances Preceding SUA | Description of Acceleration |
|------|-------------------------|-------|------------------------------|-----------------------------|
| 9/21/2013 | 10545230 | S | "car was going at about 5 mph down a short residential driveway" | "100%" |
| 9/26/2013 | 10545488 | S | "at full stop waiting to turn left into the parking garage" | "surged forward very fast" |
| 7/19/2014 | 10639894 | S | "pulling into a parking space" | "vehicle surged forward" |
| 7/19/2014 | 10639935 | S | "Pulled slowly in to a parking spot and my car was at a stop position" | "100%" |

Plaintiffs' Opposition to Defendant Motion to Dismiss and/or Strike
Case No.:  8:16-cv-02282-JVS-KESx

| 8/4/2015 | 10749575 | S | Not reported | "Maximum acceleration rate" |
|---|---|---|---|---|
| 11/25/2015 | 10810457 | S | "approaching parking space" | "97%" |
| 9/14/2015 | 10836289 | S | "Car was going very slow as the driver was turning to exit the compound through a gated entrance" | "84%" |
| 5/6/2016 | 10864163 | S | Incident #1: "at a stop sign" | "car surged forward aggressively" |
| 5/6/2016 | 10864163 | S | Incident #2: "pulling into garage | "97%) |
| 5/11/2016 | 10864353 | S | "driving slowly ~5MPH in a Wal Mart parking lot" | "car accelerated 'fully'" |
| 6/10/2016 | 10874744 | S | "during parking maneuver" | "98%" |
| 9/16/2016 | 10910065 | S | "drove car into parking space at school" | "car accelerated on its own" |
| 1/5/2017 | 10949955 | S | "stopped at stoplight" | "the car took off at top speed" |
| 12/2/2016 | 10953656 | S | "pulled into driveway at home" | "Accelerated to 40-60 MPH" |
| 1/26/2016 | Plaintiff Khansari | S | "near[ing] parking spot" | "full power acceleration" |
| 8/15/2016 | Carole Tomko | S | "driving slowly in a parking lot" | "100%" |
| 1/20/2017 | Carole Tomko | S | "in parking lot preparing to park" | "100%" |
| 6/4/2016 | 10873117 | X | "entering a parking stall" | "accelerated at high speed" |
| 7/28/2016 | 10893066 | X | "while attempting to park" | "accelerated without warning" |
| 7/8/2016 | 10898260 | X | "while slowly pulling into parking space" | "100%" |
| 5/23/2016 | 10908051 | X | "while turning left to enter a very narrow garage entrance" | "100%" |
| 9/22/2016 | 10909588 | X | "going up the driveway waiting for my garage door to open" | "car took off" |

8

| 9/29/2016 | 10910701 | X | "driving in a parking lot" | "X went from 20 to 50 MPH in about 2 seconds" |
|---|---|---|---|---|
| 10/7/2016 | 10915633 | X | "while parking the vehicle" | "accelerated while pressing the brake pedal" |
| 12/13/2016 | 10935272 | X | "pulled into parking lot, proceeded into spot | "car lurched forward and sped up" |
| 11/2/2016 | 10939234 | X | "turning left into a parking spot at a very low speed" | "car suddenly accelerated with extreme force" |
| 2/27/2017 | 10957394 (Plaintiff Shastrula) | X | "was about to park the car (around 6 miles per hour may be)" | "suddenly accelerated" |
| 9/10/2016 | Plaintiff Son | X | "slowed vehicle to approximately 6 miles per hour and made left turn easing into his driveway" | "100%" |
| 12/5/2016 | Plaintiff Jarrahi | X | "at complete stop a she waited for crossing guard to allow her to make a right turn" | "vehicle accelerated at what felt like full power" |

(*See* FAC ¶¶ 28, 61, 63, 67-78.)

All told, that is 29 separate reported instances of sudden unintended full power acceleration under nearly identical circumstances. And those are only those incidents that were reported to NHTSA. Defendant is undoubtedly aware of many more SUA claims in its vehicles that were not reported to NHTSA. (FAC ¶ 24.) Yet, in the face of this evidence, Tesla continues to blithely assert that "each sudden acceleration incident alleged in the FAC was the result of driver error [and] denies that its cars are defective in any way." (Mot. at 8:14-15.)

9

# III   LEGAL STANDARD

In ruling on a motion to dismiss pursuant to Federal Rules of Civil Procedure, Rule 12(b)(6), the Court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009). "A claim may be dismissed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001) (citations and quotations omitted). The complaint need not "contain detailed factual allegations," but only plead "enough facts to state a claim to relief that is plausible on its face." *Cousins*, 568 F.3d at 1068 (9th Cir. 2009). Facial plausibility is satisfied when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[A] complaint is required only to give the notice of the claim such that the opposing party may defend himself or herself effectively." *Starr v. Baca*, 652 F.3d 1202, 1212 (9th Cir. 2011).

# IV   ARGUMENT

## A.   Plaintiffs Have Adequately Plead Breach of Express Warranty and Breach of Contract/Common Law Warranty Claims

Defendant contends that Plaintiffs' express warranty claims fail for two reasons: 1) Tesla's Basic New Vehicle Limited Warranty covers only "defects in the materials or workmanship of any parts manufactured or supplied by Tesla" and Defendant argues that Plaintiffs fail to allege any manufacturing defect is the cause of sudden unintended acceleration; and 2) no additional warranties were created by Tesla's marketing materials and, even if there were, Plaintiffs fail to allege that they perceived or relied upon these marketing statements in deciding to purchase or lease their Tesla vehicles. Defendant is correct in two regards: the Basic New Vehicle Limited Warranty does state that it "covers the repair or replacement necessary to correct defects in the materials or workmanship of any parts manufactured or supplied by Tesla that occur under normal use for a period of 4

10

years or 50,000 miles (80,000 km), whichever comes first," (FAC ¶ 142), and the FAC does specifically allege that Plaintiffs' relied upon the specific marketing representations Tesla made with regard to the safety of the vehicle. Defendant is wrong, however, in its contention that either of these points entitles it to the dismissal of Plaintiffs' express warranty claims. First, the FAC alleges both design *and* manufacturing defects related to sudden unintended acceleration. Second, where, as here, Tesla directly marketed and sold and/or leased its vehicles to Plaintiffs, its express representations regarding the safety of these vehicles is deemed to be a basis of the bargain and Plaintiffs are not required to plead the perceived or relied upon specific individual representations.

1.   **Plaintiff Adequately Pleads Defects in Materials and Workmanship, in Addition to Allegations of Design Defect, That Are Covered by Tesla's Basic Vehicle Limited Warranty**

While Defendant is correct that the Basic Vehicle Limited Warranty does not expressly cover defects in design, Defendant erroneously contends that Plaintiffs do not adequately allege defects in materials and workmanship. Plaintiffs allege that Model S and Model X vehicles are defective both in their design and in their manufacture. (*See* FAC ¶¶ 156, 198 ("the Model S and Model X suffer from a defective design(s) and/or manufacturing defect(s)"); ¶ 221 ("defective design, manufacturing, and lack of sufficient warnings caused them to have an unreasonably dangerous propensity to suffer from sudden unintended acceleration"); ¶¶ 167, 249 ("Tesla breached these warranties as described in more detail above, but generally by not repairing or adjusting the Defective Vehicles' materials and workmanship defects").

Defendant argues that the references to defects in "manufacturing," "materials," and "workmanship" are conclusory. Citing *McCabe v. American Honda Motor Co.*, 100 Cal. App. 4th 1111, 1120, 123 Cal. Rptr. 2d 303 (2002), for not alleging how Tesla "assembled particular vehicles improperly" or that "certain vehicles 'perform differently from other ostensibly identical units of the same product line," and do not even "*refer* to the materials used to build the Model S or Model X; let alone point to any issues with

Plaintiffs' Opposition to Defendant Motion to Dismiss and/or Strike
Case No.: 8:16-cv-02282-JVS-KESx

such materials.  (Mot. at 9:4-13.)  But Defendant's reliance on *McCabe* is misplaced because that decision was rendered following the trial court's granting of the defendant's motion for summary judgment, after the plaintiff had been afforded the opportunity to conduct discovery – not at the pleading stage.

Defendant's reliance on the memorandum disposition in *Troup v. Toyota Motor Corp.*, 545 Fed App'x 668 (9th Cir. 2013) is similarly misplaced.  Though the brief treatment was largely devoid of facts, the court, citing *McCabe*, held that "despite its scattered references to "materials", the gravamen of the complaint is that *the Prius's defect resulted from the use of resin to construct the gas tanks, which is a design decision*." *Id.* at 669 (emphasis added).  Here, Plaintiffs allege that "there are defects in the vehicle control systems that permit sudden unintended acceleration to occur; the vehicles do not have an adequate fail-safe to protect against such SUA events; and the accelerator control system was not adequately tested."  (FAC ¶ 195.)

Here, Plaintiffs have not yet received discovery into the material specifications called for by the designs of the subject vehicles nor to ascertain the exact mechanism by which these vehicles exhibit sudden unintended acceleration.  What Plaintiff has pleaded is that there have been an alarmingly high number of its vehicles exhibiting full power acceleration while either stopped or moving very slowly, most often in the process of parking.  In response, Tesla contends that each and every one of these incidents is the "result of driver error" – that for some unknown reason, Tesla drivers are mistakenly commanding full power acceleration from these immensely powerful vehicles while parking in their garages, at their workplaces, at the store, or in some instances when stopped at a traffic signal, at rates more than 70 times that of drivers of other vehicles.  The pattern is obvious, even without having the benefit of Tesla's knowledge of similar complaints it has received that were not made public.

Plaintiffs submit that at this early pleading stage, these allegations are sufficient to allege a breach of Basic Vehicle Limited Warranty.  *See Hardt v. Chrysler Group,* No. SACV1401375SJOVBKX, 2015 WL 12683965, at *9 (C.D. Cal. June 15, 2015) (finding

1   that the "plaintiff adequately alleged a manufacturing defect that falls within the material

2   and workmanship provision of the express warranty" when plaintiff alleged that "the

3   Manual Transmission contains one or more design and/or manufacturing defects.")

4   However, even assuming *arguendo* that the FAC does not adequately allege the precise

5   nature of the defect in materials and workmanship, as the following section will

6   demonstrate, this is not fatal to Plaintiffs' claims.

### 2. Tesla's Specific Representations Regarding the Safety of the Model S and Model X Vehicles Create Additional Warranties Not Limited to Defects in Workmanship and Materials

10   "In order to prevail on an express warranty claim, a plaintiff must prove that the

11   seller or manufacturer: (1) made an affirmation of fact or promise or provided a

12   description of its goods; (2) the promise or description formed part of the basis of the

13   bargain; (3) the express warranty was breached; and (4) the breach caused harm to the

14   plaintiff." *Harlan v. Roadtrek Motorhomes, Inc.*, No. 07-CV-0686 IEG (BLM), 2009

15   WL 928309, *13 (S.D. Cal. Apr. 2, 2009).  In this case, Tesla has further breached its

16   express warranty by making affirmations of fact that were part of the basis of the bargain.

17   As set forth in the FAC and summarized in section II. A., *infra*, Tesla has made numerous

18   express and explicit representations that the Model S was "designed from the ground up

19   to be the safest car on the road," (FAC ¶ 51), and the Model X as "the safest, fastest and

20   most capable sport utility vehicle in history." (FAC ¶ 18).  Moreover, Tesla explicitly

21   marketed these vehicle as having specific safety features, such Forward Collision Alert

22   and Automatic Emergency Breaking.  Similarly, Tesla marketed its Model X SUV as

23   being "designed to be the safest car on the road," with every Model X coming "standard

24   with automatic emergency braking and side collision avoidance to prevent accidents from

25   happening in the first place."  (*Id.* ¶ 55.)  Tesla marketed these systems as "collision

26   avoidance features . . . are designed to increase the safety of you and your passengers."

27   California law provides that an express warranty may be created by "(1) [a]ny

28   affirmation of fact or promise made by the seller to the buyer which relates to the goods

13

and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise; (2) [a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." California Comm. Code § 2313.  Tesla made these representations about the overall safety of its vehicles, and about the function of the collision avoidance systems, in particular, in advertising and marketing materials and, therefore, these representations constitute express warranties.  *See Williams v. Beechnut Nutrition Corp.*, 185 Cal. App. 3d 135, 142, 229 Cal. Rptr. 605, 608 (1986) (holding that the plaintiff sufficiently pleaded a claim for breach of express warranty by alleging that the defendant "utilized the advertising media to urge the use and application of the subject product and expressly warranted to the general public including plaintiff herein, that said product was effective, proper and safe for its intended use.")

The Model S and Model X are two of the fastest accelerating production vehicles on the road today, while simultaneously, the available evidence also strongly suggests they are the most likely to experience sudden unintended acceleration. As such, they do not conform to Tesla's description of them as the safest cars on the road.  Furthermore, the collision avoidance systems touted by Tesla as being designed to prevent accidents from happening in the first place, have been shown to be completely ineffectual in preventing violent collisions caused by sudden unintended acceleration.  Therefore, these express warranties have been breached.  This is significant because the additional express warranties created by Tesla's marketing materials do not exclude design defects.  And any attempt by Tesla to limit damages for breach of these additional warranties must be rejected.  While Tesla's formal Warranty Manual attempts to so limit damages, damages for breach of the express safety warranty created by Tesla's advertising campaign are *not* similarly limited.  Indeed, Tesla has pointed to no language purporting to limit damages for breach of the express safety warranty, and thus there is no basis for any claim that damages are so limited.

Plaintiffs' Opposition to Defendant Motion to Dismiss and/or Strike
Case No.:  8:16-cv-02282-JVS-KESx

a.    **Because Tesla Is the Direct Seller of the Model S and Model X Vehicles to Its Customers, Plaintiffs Need Not Allege Specific Reliance on Tesla's Representations**

Citing this Court's decision in *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, Defendant contends that Plaintiffs must "specifically allege that they saw the statements before the purchase." 754 F. Supp. 2d 1145, 1182 (C.D. Cal. 2010). However, in so arguing Defendant ignores its own unique position in the distribution of its vehicles.

Unlike traditional car auto manufacturers that distribute their vehicles through a network of independently owned dealerships, Tesla – in additional to designing, developing, and manufacturing its vehicles – also markets and sells its vehicles through Tesla stores, as well as via the Internet. As of October 2016, the company operated a network of 99 Tesla Stores and Galleries in the United States, of which 28 are located within California. (FAC ¶ 45.) This is a significant distinction because California courts hold that "to prevail on a breach of express warranty claim, the plaintiff must prove (1) the seller's statements constitute an "'affirmation of fact or promise'" or a "'description of the goods'"; (2) the statement was "'part of the basis of the bargain'"; and (3) the warranty was breached." *Keith v. Buchanan*, 173 Cal. App. 3d 13, 20, 220 Cal. Rptr. 392 (1985).

The California court of appeals decision in *Weinstat v. Dentsply Intern., Inc.*, 180 Cal. App. 4th 1213, 103 Cal. Rptr. 614 (2010) is instructive on what constitutes "part of the basis of the bargain" under California law. The court there rejected the defendant manufacturers contention that the plaintiffs breach of express warranty claims should have been dismissed because they could not allege that they saw certain representations made by the manufacturer until after the time of purchase. The court observed that the "'whole purpose'" of warranty law is 'to determine what it is that the seller has in essence agreed to sell . . . .' Therefore, in keeping with this purpose, section 2313 focuses on the seller's behavior and obligation—his or her affirmations, promises, and descriptions of

the goods—all of which help define what the seller 'in essence' agreed to sell" (*Id.* at 1228-29 (internal citations omitted). But the court went further, explaining that "while the basis of the bargain of course includes dickered terms to which the buyer specifically assents, section 2313 itself does not suggest that express warranty protection is confined to them such that affirmations by the seller that are not dickered are excluded. Any affirmation, once made, is part of the agreement unless there is 'clear affirmative proof' that the affirmation has been taken out of the agreement." *Id.* at 1229.

The law is well-settled that where, as here, the Plaintiffs are in direct privity with the defendant seller, reliance is not required to establish a claim for breach of express warranty. As explained by another court in the Central District, where an express warranty claim alleged against a product seller, the claim is based on privity and, therefore, reliance is not required. *Asghari v. Volkswagen Group of Am., Inc.*, 42 F. Supp. 3d 1306, 1333-1338 (C.D. Cal. 2013); *see also Coleman v. Boston Scientific Corp.,* 1:10–CV–01968, 2011 WL 3813173, *5 (E.D. Cal. Aug. 29, 2011) (stating that "reliance (or some other substitute for privity) is required for an express warranty claim against a non-selling manufacturer of a product"); *Keegan v. American Honda Motor Co., Inc.*, 284 F.R.D. 504, 546 (C.D. Cal. 2012) (holding that only in the absence of privity does California law require a showing that the plaintiff relied on an alleged omission or representation to allege a claim for breach of express warranty).

All of the authority cited by Defendant in support of its contention that reliance is required are inapposite because in each of those cases privity between the plaintiffs and the defendants was lacking.

The same is true for Plaintiffs breach of express warranty claims under North Carolina and Ohio law. *Id.* (holding that although reliance is ostensibly an element of express warranty under North Carolina law, "the legislative history of § 25–2–313, however, indicates that proof of reliance in the formal sense is generally not required, as the element generally addresses 'affirmations of fact by the seller, descriptions of the goods or exhibitions of samples,' and other 'affirmations of fact by the seller about the

16

goods during a bargain' during negotiations"); *Horn v. Boston Scientific Neuromodulation Corp.*, No. CV409–074, 2011 WL 3893812, *11 (S.D. Ga. Aug. 26, 2011) ("[T]he 'whole purpose of the law of warranty is to determine what it is that the seller has in essence agreed to sell,' and the goal of the U.C.C. was to reflect 'actual practice that affirmations of fact made by the seller about the goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement.' U.C.C. § 2-313 cmts. 3-4.).

Because Plaintiffs are each in direct privity with Defendant Tesla, there is simply no requirement that Plaintiffs relied upon Tesla's misrepresentations included in its marketing and owner's manuals in order to allege a claim for breach of express warranty.

**B.   Plaintiff Shastrula Concedes the Ohio Deceptive Trade Practices Act Cause of Action (Count 23)**

Plaintiff Shastrula concedes that he does not have standing as a consumer to bring a claim under the Ohio Deceptive Trade Practices Act and, therefore does not oppose dismissal of Count 23 of the FAC.

**C.   Plaintiffs Sufficiently Pleaded a Cause of Action Under the Ohio Consumer Sales Practices Act (Count 22)**

Under the Ohio Consumer Sales Practices Act ("OCSPA"), "a class action is permitted under the Act if the plaintiff alleges that the substantive provisions of the Act have been violated, and (1) a specific rule or regulation has been promulgated under the Ohio Rev. Code Ann. § 1345.05 that specifically characterizes the challenged practice as unfair or deceptive, or (2) an Ohio state court has found the specific practice either unconscionable or deceptive in a decision open to public inspection." *Johnson v. Microsoft Corp.*, 2003-Ohio-7153, ¶ 21, 155 Ohio App. 3d 626, 636, 802 N.E.2d 712, 720 (2003).  The statute states that a consumer may qualify for class action certification under the OCSPA if the alleged violation of the OCSPA is substantially similar to an act or practice previously declared to be deceptive by an Ohio administrative rule or an Ohio

state court decision.  *Blankenship v. CFMOTO Powersports, Inc.*, 2011-Ohio-948, ¶ 13, 161 Ohio Misc. 2d 5, 12, 944 N.E.2d 769, 774.  "'Substantial similar' means a similarity not in every detail, but in essential circumstances or conditions." *Marrone v. Philip Morris USA, Inc.*, 2006-Ohio-2869, ¶ 24, 110 Ohio St. 3d 5, 10, 850 N.E.2d 31, 36 (2006) (citation omitted.)

**1.    Defendant Had Sufficient Notice that Its Conduct Violated OCSPA Through Specific Rules and Regulations and Relevant Case Law**

Defendant's actions and practices are *per se* deceptive and unconscionable as defined by the OCSPA.  Defendant had notice that their conduct violated the relevant rules and regulations that categorize their actions as deceptive and unfair under the OSCPA.  OCSPA and its relevant substantive rules can be found in the Ohio Rev. Code Ann § 1345.01, *et seq*., and the Ohio Administrative Code ("O.A.C.") § 109:4-3-01, *et seq*.

In section 1345.02 of the Ohio Revised Code, it specifically defines certain acts or practices as deceptive including, but not limited to, the following:

> (1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits it does not have;

> (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;

> (4) That the subject of a consumer transaction is available to the customer for a reason that does not exist;

> (10) That a consumer transaction involves or does not involve a warrant, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false.

Further, section 1345.03 defines certain acts or practices as unconscionable including, but not limited to, the following:

> (1) Whether the supplier has knowingly taken advantage of the inability of the customer reasonably to protect the consumer's interests because of the consumer's . . . inability to understand the language of an agreement;

> (3) Whether the supplier know at the time the consumer transaction was entered into that the price was substantially in

18

excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers; and

(6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment.

Under the Ohio Administrative Code, Ohio has codified certain acts and practices that violate the OCSPA.

O.A.C. § 109:4-3-02 states:

It is a deceptive act or practice in connection with a consumer transaction for a supplier, in the sale or offering for sale of goods or services, to make any offer in written or printed advertising or promotional literature without stating clearly and conspicuously in close proximity to the words stating the offer any material exclusions, reservations, limitations, modifications, or conditions.

O.A.C. § 109:4-3-10 states:

It shall be a deceptive act or practice in connection with a consumer transaction for a supplier to: Make any representations, claims, or assertions of fact, whether orally or in writing, which would cause a reasonable consumer to believe such statements are true, unless, at the time such representations, claims, or assertions are made, the supplier possesses or relies upon a reasonable basis in fact such as factual, objective, quantifiable, clinical or scientific data or other competent and reliable evidence which substantiates such representations, claims, or assertions of fact.

Plaintiffs' FAC alleges that Defendant violated the Ohio Consumer Sales Practices Act by falsely representing its vehicle as safe in violations of the above referenced rules and regulations. (*See* FAC ¶¶ 19, 30, 34, 35, 51, 59, 84.)

In *Blankenship v. CFMOTO Powersports, Inc.*, the court held plaintiff validly asserted a class action under the OCSPA. 2011-Ohio-6946, 166 Ohio Misc. 2d 21, 32, 961 N.E.2d 750, 758. In *Blankenship*, plaintiff brought a class action against the manufacturer alleging that the motorcycle had a deficient brake system and that defendants had violated the OCSPA by falsely representing that the motorcycle was safe to drive. The plaintiff also alleged that the "defendant represented through advertising and other marketing communications that the vehicles were new and free from defects

19

and could be driven safely in normal operation.  It is alleged that instead, the vehicles were not of the 'standard, quality, or grade' they were represented and/or advertised to be." *Id.* at ¶ 3.  The court held that "defendant's alleged violations of the CSPA are substantially similar to an act or practice (false representations and marketing) previously declared to be deceptive, such that they were on notice that their alleged actions or practices could have been in violation of the CSPA." *Id.*

Here, Plaintiffs similarly alleged Defendant misrepresented that their vehicles were defect free and safe under normal operation.  (*See* FAC ¶¶ 19, 30, 34, 35, 51, 59, 84.) However, Defendant's Model S and Model X vehicles are demonstrably defective as they are susceptible to sudden unintended acceleration causing serious injury.  (*Id.*, Part IV. Section C (detailing several NHTSA complaints involving sudden unintended acceleration).)  Defendant's conduct are *per se* violations of the OCSPA and Defendant had sufficient notice of its wrongful conduct through specific rules and regulations and relevant case law.

**D.    Plaintiffs Sufficiently Pleaded a Cause of Action Under the Georgia Uniform Deceptive Trade Practices Act (Count 13)**

Georgia's Uniform Deceptive Trade Practices Act ("GUDTPA") states "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under the principles of equity and on terms that the court considers reasonable."  Ga. Code Ann. § 10-1-373(a).

Defendant claims that Plaintiffs are barred from asserting a cause of action under GUDTPA because no future injury can be asserted.  (Mot. at 14:11-17.)  However, Plaintiffs' FAC seeks appropriate injunctive relief, including, without limitation, an order requiring Defendant to repair, recall, and/or replace the Model S and Model X and extend the applicable warranties to a reasonable period of time, or, at a minimum to provide Plaintiffs and Class Members with appropriate curative notice regarding the existence and cause of sudden unintended acceleration.  (FAC, Prayer for Relief.)  Plaintiffs also allege that "Tesla has failed to properly disclose, explain, fix, or program safeguards to

1    correct the underlying problem of unintended acceleration.  This leaves tens of thousands

2    of Tesla owners with vehicles that could potentially accelerate out of control." (*Id.* ¶ 30.)

3    Not only will Plaintiffs continue to be harmed by Tesla's inaction and unwillingness to

4    correct misrepresentations, but this is compounded by the fact that Plaintiff Shastrula is in

5    possession of his vehicle and may experience the same catastrophic unintended

6    acceleration in his Model X in the future.

7         Defendant curiously relies heavily on *Garcia v. Chrysler Group, LLC*, 127 F.

8    Supp. 3d 212 (S.D.N.Y. 2015) to support their contention that Plaintiffs lack future injury

9    required for injunctive relief. (Mot. at 15:4-28.)  However, in *Garcia*, all of the Georgian

10   party plaintiffs subsequently repaired their vehicle's Totally Integrated Power Module

11   ("TIPM") defects in 2014, at least a year before the court's order on September 1, 2015.

12   *Garcia*, 127 F. Supp. 3d at 221.  Thereby, resolving any potential future harm as the

13   defects were no longer present.

14        Here, Defendant refuses to fix, repair, recall, and/or program safeguards to correct

15   the sudden unintended acceleration defects; and unlike the *Garcia* case, Plaintiffs are in

16   possession of their Model S or Model X vehicles with continuing sudden unintended

17   acceleration defects.  (FAC ¶ 187.)  Tesla is the sole party with exclusive access to their

18   own vehicle's self-driving and acceleration controls, which is deeply imbedded into the

19   vehicle's own proprietary programing.  (*See id.* ¶¶ 4, 5, 8.)  Plaintiffs have no way of

20   accessing or any means of changing Tesla's programing and preventing future

21   unintended accelerations.  This is a problem exclusively in the control of Tesla and only

22   it can resolve this problem.  Defendant continues to misrepresent and blame Plaintiffs for

23   Tesla's own safety defects, while Plaintiffs are continually at the mercy of Tesla's

24   willingness to fix, repair, recall, and/or program safeguards into their vehicles; until then,

25   Plaintiffs will continue to suffer future harm and potentially serious injuries.  Defendant's

26   wrongful conduct continues to occur, is still perpetuated, and repeated.  (*See id.* ¶ 128.)

27   //

28

Plaintiffs' Opposition to Defendant Motion to Dismiss and/or Strike
Case No.:  8:16-cv-02282-JVS-KESx

**E.      Plaintiffs Sufficiently Pleaded a Cause of Action Under the Georgia Fair**
**Business Practices Act (Count 14)**

Georgia's Fair Business Practices Act ("GFBPA") requires "[a]t least 30 days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be delivered to any prospective respondent." Ga. Code Ann. § 10-1-399(b).  The notice requirement of the GFBPA is to be liberally construed, and the question of sufficiency of notice is a question for the court.  *Lynas v. Williams*, 216 Ga. App. 434, 435, 454 S.E.2d 570, 573 (1995); *Plaza Pontiac, Inc. v. Shaw*, 158 Ga. App. 799, 800, 282 S.E.2d 383, 386 (1981).  Georgia Appellate Courts have held that "a notice is sufficient if it apprises the recipient 'of the underlying facts giving rise to' the sender's claim; it need not cite the appropriate Code section."  *Stringer v. Bugg*, 254 Ga. App. 745, 747, 563 S.E.2d 447, 449 (2002) (citing *Colonial Lincoln-Mercury Sales, Inc. v. Molina*, 152 Ga. App. 379, 383, 262 S.E.2d 820, 823 (1979).)

**1.      Defendant Had Pre-Suit Written Notice of Pending Litigation**

The GFBPA's purpose is to facilitate settlements and the statute provides that "any written tender of settlement which is rejected by the claimant may . . . thereby limit any recovery to relief."  Ga. Code Ann. § 10-1-399(b); *see Crown Ford, Inc. v. Crawford*, 221 Ga. App. 881, 883, 473 S.E.2d 554, 557 (1996) (finding a Defendant's settlement offer pursuant to Ga. Code. Ann. §10-1-399(b) cuts off plaintiff's recovery to the relief.)

Here, Plaintiffs filed the original complaint on December 30, 2016, naming Ji Chang Son as the party plaintiff on behalf of all similarly situated plaintiffs.  Plaintiff Son also served Tesla with a notice letter providing it with the opportunity to correct its business practices.  On February 27, 2017, Plaintiff Shastrula was injured and Plaintiffs amended the complaint on March 1, 2017, pursuant to Court Order adding additional party plaintiffs.  Defendant had written notice of pending litigation concerning their vehicle's sudden unintended acceleration defects.  Defendant had sufficient time to discuss a resolution of this action, yet opted for further litigation.  Any pre-suit notice to

Defendant prior to Plaintiff Shastrula joining this action, via an amended complaint, after over sixty (60) days from the first filing is a hollow notice.

Defendant cites *Corcoran v. CBS Health Corp.*, 169 F. Supp. 3d 970 (N.D. Cal. 2016) as support for their contention that earlier versions of a complaint do not satisfy the pre-notice requirement. However, in *Corcoran* an earlier complaint named the same plaintiff as a party to the same action. Here, Plaintiff Shastrula was not a party to the original complaint and joined the litigation well after Defendant received notice of this action.

Further, NHTSA maintains an online complaint database where consumers can file complaints regarding vehicle issues they experienced. (FAC ¶ 60). The FAC details countless complaints placing Defendant on notice as early as September 2013 regarding vehicle issues with sudden unintended acceleration. (*See id.* Part I, Section C.) Once Plaintiff Ji Chang Son filed the original complaint, Defendant had pre-suit written notice of pending class action litigation nationwide and sufficient time to correspond with Plaintiffs on any resolution. Defendant's failure to efficiently resolve the case, as proposed by the statute, undermines their argument for any defects in pre-suit notice.

## 2. Alternatively, Plaintiffs Respectfully Request the Court Dismiss the Georgia Fair Business Practices Act Claim Without Prejudice

Even if the Court does not find notice sufficient, Plaintiffs' request the court to grant the motion to dismiss without prejudice and permit reasonable time to provide notice and amend the complaint. *See In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 183 (D. Me. 2004) (applying Georgia's Fair Business Practices Act and dismissing the claim for insufficient notice without prejudice); *see also*, *Nickens v. Equifax Info. Servs., LLC*, No. 1:13-CV-0333-TWT-ECS, 2013 WL 4786975, at \*4 (N.D. Ga. Sept. 6, 2013) (permitting plaintiff to file a 30-day notice of intent to bring claims against defendant and a subsequent amended complaint to correct any notice defects under the statute.)

Plaintiffs' Opposition to Defendant Motion to Dismiss and/or Strike
Case No.:  8:16-cv-02282-JVS-KESx

**F.      Plaintiffs Validly Assert Georgia's Unjust Enrichment Claim in the Alternative (Count 18)**

Under Rule 8(d)(2) of the Federal Rules of Civil Procedure, "a party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in *a single court* or defense *or in separate ones*." (Emphasis added.)

Defendant claims that the FAC alleges an enforceable contract and seeks unjust enrichment claims. Defendant's argument, however, ignores the fact that "Georgia law . . . permits a plaintiff to proceed to trial on alternative theories of recovery." *Wingate Land & Dev., LLC v. Robert C. Walker, Inc.*, 252 Ga. App. 818, 821, 558 S.E.2d 13, 16 (2001); *see Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301, 1309 (N.D. Ga. 2012) (finding the plaintiff had validly stated a claim for unjust enrichment, which was pleaded in the alternative to her claim for breach of contract.)

Here, Plaintiffs validly pleaded unjust enrichment in the alternative to any enforceable contract. Plaintiffs pleaded a Breach of Contract in Cause of Action 18, while alternatively pleading Unjust Enrichment in Cause of Action 19. Even if both parties do not contest the existence of a contract, "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3).

Further, other district courts have denied dismissing unjust enrichment claims, even at the summary judgement stage. *WESI, LLC v. Compass Envtl., Inc.*, 509 F. Supp. 2d 1353, 1363 (N.D. Ga. 2007) ("Other district courts have held, however, that dismissing an equitable count, even at the summary judgment stage, is not appropriate 'merely because a claimant is prohibited under Georgia law from *recovering* under a breach of contract theory and an unjust enrichment theory." (emphasis in original).)

Plaintiffs respectfully request the Court to deny Defendant's Motion to Dismiss.

**G.      Plaintiffs Request Leave to Amend to Cure Any Deficiencies**

Where pleadings are determined to be deficient, leave to amend is liberally granted. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000). Plaintiffs have properly pleaded their claims and any purported deficiencies are of a technical nature and will be

Plaintiffs' Opposition to Defendant Motion to Dismiss and/or Strike
Case No.:  8:16-cv-02282-JVS-KESx

easily corrected.  Moreover, Plaintiffs' investigation of their claims and causes of action is continuing and facts continue to be collected that are expected to further bolster Plaintiffs' allegations.  If the Court determines that Plaintiffs' First Amended Complaint is in any manner deficient, Plaintiffs respectfully request that they be permitted leave to amend the operative pleading to cure any deficiencies that the Court identifies.

## V       CONCLUSION

For the forgoing reasons stated herein, Plaintiffs respectfully request this Court to deny Defendant's Motion to Dismiss, or in the alternative, grant leave for a reasonable time to amend the First Amended Complaint to reflect the Court's order.

Dated:  April 24, 2017                          Respectfully submitted,

By:   */s/ David C. Wright*
                                                        David C. Wright
                                                        MCCUNE WRIGHT AREVALO, LLP
                                                        Attorneys for Plaintiffs